## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | ) | |
| CONSERVATION LAW FOUNDATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:20-cv-00234-JAM |
| | ) | |
| DATTCO, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **CONSENT DECREE**

WHEREAS, Plaintiff Conservation Law Foundation ("CLF" or "Plaintiff") filed this action on February 19, 2020 against DATTCO, Inc. ("DATTCO" or "Defendant");

WHEREAS, Plaintiff is a non-profit environmental organization incorporated in Massachusetts;

WHEREAS, Defendant is a transportation company operating in the State of Connecticut;

WHEREAS, Plaintiff alleged that Defendant violated the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* ("CAA" or "Act") and requirements of the Connecticut State Implementation Plan relating to motor vehicle idling limits, and sought civil penalties, injunctive relief, and Plaintiff's attorneys' fees and costs of litigation;

WHEREAS, Plaintiff and Defendant (collectively the "Parties") have negotiated this Consent Decree in good faith and at arm's length, and agree that the settlement of the above-captioned action (the "Action") through this Consent Decree without further litigation is in the public interest, and is a fair, reasonable, and appropriate means of resolving all claims in the

22711408-v2

Action;

WHEREAS, the Parties anticipate that this Consent Decree will achieve valuable environmental benefits by improving air quality in the State of Connecticut;

WHEREAS, the Plaintiff and Defendant each consent to the entry of this Consent Decree without further trial, argument, or appeal;

WHEREAS, pursuant to 42 U.S.C. § 7604(c)(3), this Consent Decree is being forwarded to the United States Department of Justice and to the United States Environmental Protection Agency ("EPA") for the forty-five (45) day review period mandated by the CAA;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Part I (Jurisdiction and Venue), below, and with the consent of the Parties,

IT IS HEREBY ADJUDGED, ORDERED AND DECREED as follows:

## I.      JURISDICTION AND VENUE

1.   This Court has jurisdiction to enter and enforce this Consent Decree under the Clean Air Act and as disposition of a federal question.  42 U.S.C. § 7604(a); 28 U.S.C. § 1331.

2.   Plaintiff gave Defendant notice by a letter (the "Notice Letter") of the violations alleged in the Complaint more than sixty (60) days prior to commencement of this lawsuit. Copies of the Notice Letter were also mailed to the Administrator of the EPA, the Regional Administrator of the EPA for Region 1, the Connecticut Department of Energy & Environmental Protection ("DEEP"), and the EPA Citizen Suit Coordinator. Neither EPA nor DEEP commenced any action prior to Plaintiff's filing of the Complaint.

3.   Defendant consents to and shall not challenge entry of this Consent Decree, or this Court's jurisdiction to enter and enforce this Consent Decree. By consenting to the Court's

2

subject matter jurisdiction to enter this Consent Decree, Defendant cannot—and so does not—waive or otherwise limit jurisdictional arguments it may make as to this or any court's subject matter jurisdiction in this or any other action.

4.   Venue is proper because the violations alleged in the Complaint occurred in this district, and the Defendant conducts business in this district.  42 U.S.C. § 7604(c)(1), 28 U.S.C. § 1391(b).

5.   Except as expressly provided for herein, this Consent Decree shall not directly create any rights in or obligations of any Party other than the Parties to this Consent Decree.

## II.      APPLICABILITY

6.      Upon the Effective Date, the obligations of this Consent Decree shall apply to, and be binding upon, Plaintiff and Defendant, and any successors, assigns, or other entities or persons otherwise bound by law.

7.      In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, or agents to take any actions necessary to comply with the provisions of this Consent Decree.

## III.     DEFINITIONS

8.      Terms used in this Consent Decree that are defined in the CAA or in regulations promulgated by EPA pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Consent Decree.

IV.   COMPLIANCE MEASURES

A.    **ANTI-IDLING POLICY**

9.      DATTCO-operated vehicles in the State of Connecticut shall comply with the State of Connecticut Idling Regulation, Regulations of Connecticut State Agencies § 22a-174-18(b)(3)(C), and, as applicable, Connecticut General Statutes § 14-277.

10.     DATTCO shall review and update its anti-idling policy for its operations in the State of Connecticut which shall conform to and be no more permissive than the State of Connecticut Idling Regulation, Regulations of Connecticut State Agencies § 22a-174-18(b)(3)(C), and, as applicable, Connecticut General Statutes § 14-277.

11.     The anti-idling policy shall require that DATTCO's vehicle operators comply with the idling requirements set forth in the State of Connecticut Idling Regulation, Regulations of Connecticut State Agencies § 22a-174-18(b)(3)(C) and Connecticut General Statutes § 14-277.

12.     The anti-idling policy shall contain the following statement: "The United States Environmental Protection Agency has stated that 'idling vehicles contribute to air pollution and emit air toxins, which are pollutants known or suspected to cause cancer or other serious health effects.'"

13.     CLF shall have the opportunity to review and comment on DATTCO's updated anti-idling policy.

14.     DATTCO shall review and update its general policy and training materials in the State of Connecticut to ensure compliance with its updated anti-idling policy.

15.     When the review and update of its anti-idling policy is finalized, DATTCO shall provide the policy to all drivers and their supervisors, train all drivers on the anti-idling policy

and require drivers to sign an acknowledgement of the anti-idling policy, all in a language needed for their comprehension.

16.     DATTCO shall train all of its new drivers in the State of Connecticut on the anti-idling policy and require its new drivers to sign an acknowledgement of the policy.

17.     DATTCO shall provide reminders to all of its drivers in the State of Connecticut regarding the anti-idling policy at periodic safety meetings.

18.     DATTCO shall review all of its training materials and signage in the State of Connecticut to ensure they are consistent with the anti-idling policy, and materials and signage shall be revised as necessary.

19.     Any DATTCO driver that routinely violates DATTCO's anti-idling policy in the State of Connecticut shall be retrained and required to sign a new acknowledgement of the policy.

**B.     AUTOMATIC SHUTOFF TECHNOLOGY**

20.     DATTCO shall install and operate automatic engine shut-off technology as follows to prevent idling for longer than three (3) minutes:

> a.     Within 120 days of the Effective Date, DATTCO shall install and operate automatic engine shut-off technology on its entire motor coach fleet in the State of Connecticut and continue to operate such technology through the term of the Consent Decree.

> b.     Within 120 days of the Effective Date, DATTCO shall install and operate automatic engine shut-off technology on its entire Type 1 diesel school bus fleet in the State of Connecticut and continue to operate such technology through the term of the Consent Decree.

5

## C.    IDLING MONITORING MEASURES

<u>Site Anti-Idling Monitoring</u>

21.    Within thirty (30) days of the Effective Date, DATTCO shall identify and train an employee at each site within the State of Connecticut responsible for compliance with the anti-idling policy at that particular site, including access to and review of computer tracking data when available ("Site Anti-Idling Employee"). The Site Anti-Idling Employee will, as necessary, conduct unannounced walkthroughs at his or her designated site for the purposes of identifying and abating unlawful idling and/or breaches of DATTCO's anti-idling policy.

      a.    If the Site Anti-Idling Employee observes unlawful idling, he or she shall immediately instruct the operator who is unlawfully idling to stop doing so.

      b.    If the Site Anti-Idling Employee observes unlawful idling and the operator is absent from the bus, the Site Anti-Idling Employee shall shut off the engine of the bus observed to be unlawfully idling.

      c.    The Site Anti-Idling Employee will refer any driver that routinely violates the anti-idling policy for retraining, and such driver shall be required to sign a new acknowledgement of the anti-idling policy.

22.    Each Site Anti-Idling Employee shall be responsible for preparing a tracking report each month and submitting it to the Corporate Anti-Idling Employee (as defined below). The report shall include the following information for all identified instances of excess idling during that month:

      a.    Date and time of the idling;

      b.    Approximate duration of the idling;

6

c.      Vehicle make and number;

d.      Location;

e.      Operator name; and

f.      Information the Site Anti-Idling Employee has at the time regarding any applicable regulatory exemption.

<u>Corporate Anti-Idling Monitoring</u>

23.      Within thirty (30) days of the Effective Date, DATTCO shall identify an employee at the corporate office to oversee Defendant's compliance with the anti-idling policy state-wide ("Corporate Anti-Idling Employee").

24.      The Corporate Anti-Idling Employee shall be responsible for collecting and reviewing the monthly reports from all Site Anti-Idling Employees.

25.      The Corporate Anti-Idling Employee shall also be responsible for preparing the semiannual report to be submitted to CLF, described below.

V.      RECORDKEEPING AND REPORTING

26.      DATTCO shall submit semi-annual reports to CLF identifying all instances of idling greater than three (3) minutes as identified in the monthly reports prepared by each Site Anti-Idling Employee, including any information regarding applicable exemptions. The semiannual report shall also include an update regarding DATTCO's transition to electric vehicles and any changes to the anti-idling policy, and the proposed stipulated penalty outlined below.

27.      DATTCO shall send semi-annual reports to CLF as follows: one report will be submitted by March 1 of each year during the term of the Consent Decree to cover the prior July

16 through January 15, and one report will be submitted by August 31 of each year during the term of the Consent Decree to cover the prior January 16 through July 15.

28.     Where DATTCO invokes a regulatory exemption, DATTCO shall provide information to establish that the exemption applies. CLF will have an opportunity to contest in good faith DATTCO's invocation of a regulatory exemption in connection with any instance of idling, including by submitting written questions to the Corporate Anti-Idling Employee, DATTCO staff member who completed the report, the relevant lot supervisor, vehicle operator, and/or maintenance technicians. If the Parties are unable to resolve in good faith any dispute with regard to the applicability of a regulatory exemption after a reasonable period of time, in no instance fewer than ninety (90) days, the Parties shall engage in the dispute resolution process set forth in Part XI (Dispute Resolution) of the Consent Decree.

29.     For the duration of the Consent Decree, and until ninety (90) days after termination of this Consent Decree pursuant to Part XV (Effective Date & Termination), DATTCO shall retain at least the previous six months' data of the following types (collectively the "Retained Data"):

    a.   The number of drivers receiving anti-idling training (during periodic safety meetings) pursuant to Paragraph 16 and 17;

    b.   The number of drivers receiving retraining pursuant to Paragraph 19; and

    c.   Engine diagnostic software data relating to the automatic shutoff technology, with trip information for DATTCO diesel vehicles.

30.     Plaintiff may request that DATTCO share the Retained Data with Plaintiff no more frequently than three (3) times per calendar quarter, but not more than six (6) times per calendar year, and each request may only extend to the immediately preceding three (3) months

of Retained Data. Upon receipt of such a request, DATTCO shall provide the requested Retained

Data within fifteen (15) business days of the request.

31.     Any Retained Data, semi-annual reports, or any other data or information

provided to Plaintiff pursuant to this Consent Decree is and shall remain confidential, and

Plaintiff shall not disclose or discuss any portion of such Retained Data, semi-annual reports, or

any other data or information to or with any other person, unless such disclosure is necessary as a

part of a dispute resolution process under Part XI (Dispute Resolution) or enforcement of this

Consent Decree under Part XII (Enforcement), in which case such Retained Data, semi-annual

reports, or any other data or information shall only be disclosed to the Arbitrator and/or the

Court, respectively.

## VI.     CIVIL PENALTIES

32.     Within thirty (30) days of the Effective Date, Defendant shall pay to the United

States Department of Treasury a civil penalty of $10,000. Failure to timely pay the civil penalty

shall subject Defendant to interest accruing from the date payment is due until the date payment

is made at the rate prescribed by 28 U.S.C. § 1961, and shall render Defendant liable for all

charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United

States in securing payment.

## VII.     EMISSIONS REDUCTION PROJECT

33.     Defendant shall spend, regardless of whether through financing, an

aggregate amount of $1.8 million over the term of Consent Decree period to advance its

transition to zero emissions vehicles. The $1.8 million shall include cash outlays and the

invoiced value of items secured by loans and/or capital leases and shall be net of any grant

proceeds, donations, or subsidies designated for the transition to zero emissions vehicles.

34.     The $1.8 million shall be devoted to advancement of Defendant's transition to zero emissions vehicles that would not have occurred, or would not have occurred in the time frame required under this Consent Decree, but for the settlement of this enforcement action.

35.     The $1.8 million shall be used to purchase a minimum of five (5) zero emissions buses, and it may also be used in any way that will advance Defendant's transition to zero emissions vehicles, including but not limited to:

    A.   The purchase of additional zero emissions vehicles, including school buses and/or other fleet vehicles, such as service vehicles, delivery vehicles, company cars, and safety cars;

    B.   The purchase of electric or solar-powered vehicle charging stations; and

    C.   Fees and costs associated with necessary electricity and infrastructure upgrades to accommodate charging stations and electric fleets at Defendant's yards.

36.     The $1.8 million shall be incurred as follows: at least $400,000 within one (1) year of the Effective Date, an aggregate amount of $800,000 within two (2) years of the Effective Date, and an aggregate amount of $1.8 million within five (5) years of the Effective Date.

37.     Defendant shall retain and produce consistent with Paragraph 38 documentation of the above expenditures through vendor invoices and vehicle registrations.

38.     Defendant shall submit to the Court, CLF, and the United States Department of Justice, two written reports—first a report within one (1) year of the Effective Date, and second, a report within five (5) years of the Effective Date—describing the status of the Emissions

10

Reduction Project to date, attaching documentation of the purchases made to date, as well as describing the stipulated penalties per Section VIII below, if any, that were incurred and paid into the Project.

39.     Any public statement made by Defendant in any press release, in any oral or written material promoting Defendant's environmental or charitable practices or record, or in Defendant's Annual Reports, that refers to Defendant's payments or other financial obligations under this Part shall include the following language: "Purchases were made pursuant to the settlement of a Clean Air Act enforcement suit brought by Conservation Law Foundation."

VIII.   STIPULATED PENALTIES

40.     Defendant shall accrue stipulated penalties for excess idling in violation of the State of Connecticut Idling Regulation, Regulations of Connecticut State Agencies § 22a-174-18(b)(3)(C) and/or Connecticut General Statutes § 14-277, as follows:

   a.   $50 per vehicle per occurrence for 1 to 5 minutes of unlawful idling in excess of 3 minutes.

   b.   $75 per vehicle per occurrence for 6 to 10 minutes of unlawful idling in excess of 3 minutes.

   c.   $100 per vehicle per occurrence for 11 to 30 minutes of unlawful idling in excess of 3 minutes.

   d.   $200 per vehicle per occurrence for 31 to 60 minutes of unlawful idling in excess of 3 minutes.

   e.   $500 per vehicle per occurrence for more than 60 minutes of unlawful idling in excess of 3 minutes.

41.     The stipulated penalties listed above shall be subject to a tipping basket of $2,500 per month. If Defendant accrues stipulated penalties as described above totaling $2,500 or more in any one-month period, Defendant shall pay the full amount of such stipulated penalties to the first dollar. If Defendant does not accrue $2,500 of stipulated penalties as described above in any one month, the basket is emptied, Defendant is not responsible for any stipulated penalties in that month, and the basket starts at $0 for the next month.

42.     If, within thirty (30) days of Defendant's alleged failure to report, an investigator discovers and provides good faith evidence of any instance of Defendant's excess idling in violation of the State of Connecticut Idling Regulation, Regulations of Connecticut State Agencies § 22a-174-18(b)(3)(C) and/or Connecticut General Statutes § 14-277 that are not reported to CLF per the terms of this Decree in Part V (Recordkeeping and Reporting), Defendant will pay stipulated penalties associated with the instance of idling as described in Paragraph 40; these penalties will not be subject to the tipping basket method described in Paragraph 41. Notwithstanding the foregoing, Defendant shall have an opportunity to contest in good faith an investigator's findings. If the Parties are unable to resolve in good faith any dispute with regard to the investigator's findings after a reasonable period of time, in no instance fewer than ninety (90) days, the Parties shall engage in the dispute resolution process set forth in Part XI (Dispute Resolution) of the Consent Decree.

43.     Additional penalty amounts independently accrue and are not subject to the tipping basket method described in Paragraph 41, as follows:

    a.     For failure to hire, appoint, and/or authorize a Corporate Anti-Idling Employee or, for each site, a Site Anti-Idling Employee: $750 per month per position, except that, if there becomes a vacancy in the Corporate

Anti-Idling Employee position or any of the Site Anti-Idling Employee

positions, Defendant shall have ninety (90) days to fill such vacancy from

the time the vacancy began without incurring the penalty described in this

subsection;

b.      For failure to provide Retained Data upon Plaintiff's request: $750 per

week the required information is delayed in transmittal to CLF;

c.      For failure to provide semi-annual reports: $750 per week the report is

overdue.

44.      All accrued stipulated penalties described in this Part VIII (Stipulated Penalties)

shall be added to the total amount allocated to the Emissions Reduction Project described in Part

VII.

45.      CLF may, in its sole discretion, waive stipulated penalties if it determines that

DATTCO is working in good faith to resolve the issue in a timely fashion, or for any other

reason.

46.      Payments made under Part VI and Part IX of this Consent Decree shall not be tax

deductible by Defendant.

## IX.      COSTS OF LITIGATION

47.      Consistent with 42 U.S.C. § 7604(d), Defendant shall pay by company check the

following amounts to Plaintiff, which shall resolve all claims for attorneys' fees, costs, or other

expenses:

a.      $80,000 U.S. dollars within 45 days of the Effective Date; and

b.      $80,000 U.S. dollars within one (1) year of the Effective Date.

13

48.     In the event that any payment of costs of litigation owed by Defendant under the Decree is not made on or before the due date, Plaintiff shall provide written notice to Defendant of such failure to pay on or before the due date. Defendant shall have ten (10) business days from the date of Plaintiff's notice to make payment. If Defendant does not make the payment within ten (10) business days from the date of Plaintiff's notice, in addition to a continued requirement to make said payment, Defendant shall pay to CLF liquidated attorney fees of Six Hundred Dollars ($600) for every day that a payment is late beyond ten (10) business days from the date of Plaintiff's notice.

## X.     FORCE MAJEURE

49.     "Force Majeure" is defined as any event arising from causes beyond the control of Defendant, their contractors, or any entity controlled by Defendant that causes a delay or impediment to performance in complying with any obligation under this Consent Decree despite Defendant's reasonable efforts to fulfill the obligation. Force Majeure events shall include, but are not limited to: war or violent uprising, acts of terrorism, natural disasters, labor strikes, transport delays, civil unrest, a declared state of emergency, public health concerns (which shall include without limitation the COVID-19 pandemic), and shortages impacting the zero emissions vehicle, zero emissions vehicle fuel, or electric vehicle charging markets that are beyond Defendant's control and render Defendant unable to secure equipment, supplies, or other materials as part of the Emissions Reduction Project described in Part VII. The requirement that Defendant exercise reasonable efforts to fulfill the obligation includes using reasonable efforts to anticipate any potential Force Majeure event and reasonable efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay or non-performance during such event to the greatest extent possible in light of the then-

14

prevailing Force Majeure event. Force Majeure does not include Defendant's financial inability to perform any obligation under this Consent Decree.

50.     If any event occurs or has occurred that may delay or prevent compliance with the performance of any obligation under this Consent Decree, as to which Defendant intends to assert a claim as an event of Force Majeure, Defendant shall provide written notice to CLF of such claim, as soon as practicable but no later than thirty (30) days following the date Defendant first had notice that the claimed Force Majeure event may cause such delay or impediment and give rise to a claim of Force Majeure. Upon providing notice of Force Majeure, DATTCO's time for performance of the obligations under this Consent Decree that are affected by the Force Majeure will be extended as necessary to complete those obligations, or the obligations will be eliminated if performance is no longer possible.

## XI.     DISPUTE RESOLUTION

51.     All disputes related to Part V (Recordkeeping and Reporting) and Part VIII (Stipulated Penalties) shall be subject to the binding dispute resolution process described herein.

52.     The Parties agree to work together in good faith to resolve any disputes related to Part V (Recordkeeping and Reporting) and Part VIII (Stipulated Penalties) prior to engaging in the dispute resolution process described in this Part XI of the Consent Decree.

53.     If the Parties are unable to resolve in good faith any disputes related to Part V (Recordkeeping and Reporting) and Part VIII (Stipulated Penalties) after a reasonable period of time, in no instance fewer than ninety (90) days, the Parties shall mutually select a neutral third party to make a binding determination ("Arbitrator").

54.     Each Party has the right to seek a determination from the Arbitrator with regard to a dispute related to Part V (Recordkeeping and Reporting) and Part VIII (Stipulated Penalties),

except that Plaintiff is limited to initiating five (5) such determinations during the term of the
Consent Decree; no numeric limit apples to the number of determinations initiated by Defendant.
Each Party may only seek a determination with regard to an instance of idling that is alleged to
have taken place within one (1) year prior to the Party's initiation of the determination from the
Arbitrator.

55.     A Party seeking a determination from the Arbitrator in accordance with this Part
XI of the Consent Decree (the "Disputing Party") shall submit documentation to the Arbitrator in
accordance with the time frames set forth in Paragraph 54. The other party (the "Non-Disputing
Party") shall have thirty (30) days to respond by submitting its own documentation.

56.     If the Parties remain in disagreement after submission of the documentation
referenced in Paragraph 55, the Arbitrator shall review the submitted documentation and issue a
written, binding, non-appealable determination simultaneously to both Parties.

57.     The non-prevailing Party of any dispute resolution process shall pay all costs
related to the Arbitrator and the costs incurred by the prevailing party for that particular
determination.

58.     Any stipulated penalties involved in any dispute resolution process shall not be
payable until the dispute resolution process has been resolved, either by agreement of the Parties
or by determination of the Arbitrator. Once there is a final agreement by the Parties or a final
determination of the Arbitrator, any stipulated penalties that have accrued as a result of such
agreement or determination shall be added to the total amount allocated to the Emissions
Reduction Project described in Part VII.

## XII.   ENFORCEMENT

59.   The Court shall retain jurisdiction over this case until the termination of the

Consent Decree to enforce the terms and conditions of the Consent Decree, to modify the

Consent Decree, and to resolve any disputes arising hereunder, except as set forth in Paragraph

61.

60.   Notwithstanding the foregoing Paragraph 60, any and all disputes related to Part

V (Recordkeeping and Reporting) and Part VIII (Stipulated Penalties), shall be resolved

exclusively pursuant to Part XI (Dispute Resolution) of this Consent Decree.

## XIII.   EFFECT OF SETTLEMENT

61.   Defendant does not admit any liability arising out of or related to the allegations

set forth in Plaintiff's Complaint.

62.   Entry of this Consent Decree shall resolve any and all claims, causes of action, or

liability arising under the CAA and/or Connecticut state law brought by the Plaintiff against the

Defendant for damages, penalties, fines, injunctive relief, past and future attorney's fees, past

and future costs, or any other claim or relief relating to the violations that were alleged, or could

have been alleged, in the Complaint or in this action; Plaintiff covenants not to sue, releases, and

forever discharges Defendant from all such claims, causes of action, or liabilities arising on or

before the Effective Date.

63.   CLF covenants not to sue and shall not bring any claim, cause of action, or suit

against Defendant for any alleged violations in the State of Connecticut of the same nature or

type as those described in the Complaint that occur prior to termination of the Consent Decree

pursuant to Part XV; Plaintiff's exclusive remedy and recourse for any such claims against

Defendant, or other claims related to idling of Defendant's vehicles in the State of Connecticut,

after the Effective Date and prior to termination of the Consent Decree pursuant to Part XV, shall

be through the stipulated penalties described in this Consent Decree, subject to the outcome of

any dispute resolution process.

64.     This Consent Decree shall not be construed to create rights in, or grant any cause

of action to, any third party not party to this Consent Decree.

## XIV.   NOTICES

65.     Unless otherwise provided herein, whenever notifications, submissions, or

communications are required by the Consent Decree, they shall be made in writing and

addressed as follows:

<u>For Plaintiff</u>:
Esther Ritchin
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
ertichin@clf.org

<u>For Defendant</u>:
Donald DeVivo
President
DATTCO, Inc.
583 South Street
New Britain, CT 06051
DonD@dattco.com

Kevin Ferrigno
Vice President and General Counsel
DATTCO, Inc.
315 South Street
New Britain, CT 06051
kevin.ferrigno@dattco.com

Megan Baroni
Robinson & Cole LLP
1055 Washington Boulevard
Stamford, CT 06901
mbaroni@rc.com

66.     Any Party may, by written notice to the other Party, change its designated notice recipient, address or means of transmittal provided above.

67.     All notifications, communications, or submissions made pursuant to this Part shall be sent by electronic mail if practicable, but if not practicable, then by overnight mail or overnight delivery service. Any Party planning a communication by non-electronic means should first attempt to contact the opposing Party to confirm the appropriate mailing address.

## XV.   EFFECTIVE DATE & TERMINATION

68.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's Docket (the "Effective Date").

69.     The Consent Decree shall terminate five years after the Effective Date (the "Termination Date"). If Defendant's obligation to submit semi-annual reports to CLF set forth in Paragraph 27 extends beyond the Termination Date, Defendant shall submit such semi-annual report; however, Defendant shall not be required to include any data or information regarding anything beyond the Termination Date in such semi-annual report.

## XVI.   MODIFICATION

70.     The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the Parties. Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

## XVII.  SIGNATORIES/SERVICE

71.     Each undersigned representative of the Parties certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

## XVIII.      INTEGRATION

72.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.

## XIV.  FINAL JUDGMENT

73.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Plaintiff and Defendant.

# SIGNATURE PAGE

**Conservation Law Foundation, Inc.**

By: _____   Date: __August 24, 2021__

Heather A. Govern
Conservation Law Foundation
62 Summer Street
Boston, MA 02110

**DATTCO, Inc.**

By: _____   Date: __8/23/2021__

Donald DeVivo
President
DATTCO, Inc.
583 South Street
New Britain, CT 06051

Dated and entered this ___ ___ Day of _____, ____ _____.

_____
United States District Court Judge